UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVIS CREDIT UNION,<br><br>Plaintiff,<br><br>v.<br><br>CUMIS INSURANCE SOCIETY, INC.,<br><br>Defendant. | No. 2:24-cv-00823-DAD-SCR<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>(Doc. No. 20) |

This matter is before the court on the motion for judgment on the pleadings filed on behalf of defendant CUMIS Insurance Society, Inc. on October 29, 2024. (Doc. No. 20.)[1] On November 25, 2024, the motion was taken under submission on the papers. (Doc. No. 23.) For the reasons explained below, the court will grant defendant's motion for judgment on the pleadings.

**BACKGROUND**

On May 8, 2024, plaintiff Travis Credit Union filed its operative first amended complaint ("FAC") in this action. (Doc. No. 8.) In its FAC, plaintiff alleges as follows.

---

[1] On March 15, 2024, defendant removed this action from the Solano County Superior Court where it was originally filed to this federal court pursuant to this court's diversity jurisdiction, 28 U.S.C. § 1332(a)(1). (Doc. No. 1.)

1

Between January 1, 2021 and June 30, 2022, certain of plaintiff's loan officers manipulated plaintiff's real-estate loan origination system ("LOS") to misclassify real estate loan originations for the purpose of generating commissions. (*Id.* at ¶ 7.) The involved loan officers employed two methods in carrying out this scheme. (*Id.* at ¶¶ 10–11.)

The first method the loan officers used was to misclassify real estate loan originations by changing the loan officer assignment in the LOS to reflect that an External Loan Officer had either originated the loan or had generated the loan submission package, when the External Loan Officer had not done so.[2] (*Id.* at ¶ 10.) Pursuant to plaintiff's commission plans, External Loan Officers were only entitled to commissions on externally sourced loans that they actually closed on, or retail referred loans if the External Loan Officer actually generated the loan submission package with the borrower and submitted it to the operations team. (*Id.* at ¶¶ 8–9.) In many instances, the LOS reassignment occurred shortly before or after the loans had actually funded, and as a result, plaintiff's LOS reflected a commission due to the External Loan Officer to whom the loans were reassigned. (*Id.* at ¶ 10.)

The second method the loan officers used involved misclassifying loans to make them appear to be commissionable at a higher rate. (*Id.* at ¶ 11.) Pursuant to plaintiff's commission plans, refinanced loans were commissionable at a lower rate than "new money." (*Id.*) The involved loan officers misclassified certain loans as "new money," thereby making them appear to be commissionable at the higher rate. (*Id.*)

As a result of these schemes, plaintiff suffered a total of at least $714,812.00 in losses. (*Id.* at ¶ 12.) Upon discovery of the schemes, plaintiff hired a forensic auditor to ascertain their scope and to examine its lending portfolio; that audit cost plaintiff $43,058.76. (*Id.* at ¶ 13.)

During the relevant time period, plaintiff was the insured under a fidelity bond (the "Bond") issued by defendant. (*Id.* at ¶ 6.) The Bond, a copy of which has been submitted to the court by defendant, (Doc. No. 20-2), contains the following provisions:

---

[2] Plaintiff alleges that as of April 2022, "External Loan Officers" were reclassified as "Senior Mortgage Loan Officers," but plaintiff uses the title "External Loan Officers" consistently for clarity. (Doc. No. 8 at ¶ 9.)

**A. Employee Or Director Dishonesty**

We will pay you for your loss resulting directly from dishonest acts committed by an "employee" or "director," acting alone or in collusion with others.

Such dishonest acts must be committed by the "employee" or "director" with the intent to:

a.   Cause you to sustain such loss; or

b.   Obtain an improper financial benefit for the "employee," "director," or for any other person or entity.

However, if some or all of your loss resulted directly or indirectly from a "loan" or "trade," that portion of the loss is not covered unless you establish that the portion of the loss involving a "loan" or "trade" resulted directly from dishonest acts committed by the "employee" or "director," acting alone or in collusion with others, with the intent to:

   1)   Cause you to sustain such loss; and

   2)   Obtain an improper financial benefit for the "employee" or "director," or a financial benefit for any other person or entity.

As used in this coverage, an improper financial benefit does not include any employment benefits received in the course of employment including salaries, commissions, fees, bonuses, promotions, awards, profit sharing, business entertainment or pensions.

As used in this coverage, loss does not include any employment benefits, including:  salaries, commissions, fees, bonuses, promotions, awards, profit sharing, business entertainment or pensions, intentionally paid by you.

[. . .]

**J. Faithful Performance** – **Enhanced**

We will pay you for your loss resulting directly from a named "employee's" "failure to faithfully perform his/her trust."

The Application Of Realized Earnings In Loan Losses Condition does not apply to this coverage.

[. . .]

**Failure To Faithfully Perform His/Her Trust**

"Failure to faithfully perform his/her trust" means acting in conscious disregard of your established and enforced share or deposit policies or that portion of your established and enforced lending

policy which sets out the parameters which must be met in order for a "loan" to be approved.

"Failure to faithfully perform his/her trust" does not mean:

a. Negligence, mistakes or oversights;

b. Acts or omissions resulting from inadequate training;

c. Unintentional violation of laws or regulations;

d. Unintentional violation of your policies or procedures;

e. Acts or omissions known to, acquiesced in, or ratified by your Board Of Directors;

f. Acts of an "employee" for which you could have made claim under Employee Or Director Dishonesty Coverage; or

g. Conscious disregard of any policies other than lending, share or deposit policies, including, without limitation, personnel policies, investment policies, or collection policies or that portion of any policy that relates to the collection of monies.

[. . .]

**Audit And Claims Expense**

The Audit Expense Coverage is replaced with the Audit And Claims Expense Coverage as follows:

1. We will pay you for:

   a. The necessary and reasonable fees and expenses you pay for a special audit of your records to establish a valid and collectible loss under Employee Or Director Dishonesty Coverage, Faithful Performance Coverage or Faithful Performance – Enhanced Coverage; or

   b. Reasonable expenses incurred by you with our prior written consent that are directly related to the preparation of a proof of loss in support of a claim covered under this Bond.

2. Such special audit under subparagraph 1.a. must be performed by a recognized provider of auditing services. "Employees'" salaries and other expenses are not covered without our prior consent.

3. We will not pay under subparagraph 1.a. above for:

   a. A routine or periodic audit even though it may result in the establishment of a covered loss; or

4

|   |   |   |
|---|---|---|
|   | b. | Correcting, modernizing or otherwise preparing your books and records after you have discovered a covered loss. |
| 4. | | For fees and expenses covered under subparagraph 1.a. above, we will pay you the lesser of: |
|   | a. | The Single Loss Limit Of Liability for Audit Expense Coverage shown on the Declarations; |
|   | b. | The special audit fees and expenses you paid; or |
|   | c. | 100% of the covered loss under Employee Or Director Dishonesty Coverage, Faithful Performance Coverage or Faithful Performance – Enhanced Coverage. |
| 5. | | Audit And Claims Expense Coverage is in addition to whatever coverage may ultimately be available under this Bond for loss that is the subject of such special audit. |
| 6. | | Any covered fees or expenses will be paid only after settlement of the covered loss under this Bond. |
| 7. | | We shall have no liability to pay any such fees or expenses, if the amount of the covered loss does not exceed the Single Loss Deductible Amount applicable to the coverage under which the loss was covered. |

(Doc. No. 20-2 at 27, 31, 49, 96–97.)

On August 9, 2022, plaintiff filed a claim with defendant. (*Id.* at ¶ 15.) On August 11, 2022, defendant assigned a claim number and informed plaintiff that it would review the claim for potential coverage, including under the "Employee or Director Dishonesty" and the "Faithful Performance – Enhanced" coverage provisions of the Bond. (*Id.*) On November 17, 2022, plaintiff submitted proof of loss to defendant. (*Id.* at ¶ 19.) On September 14, 2023, defendant denied coverage. (*Id.*)

Based on these allegations in its FAC, plaintiff asserts the following three causes of action against defendant: (1) a breach of contract claim; (2) a breach of the covenant of good faith and fair dealing claim; and (3) a declaratory relief claim regarding defendant's indemnity obligations. (*Id.* at ¶¶ 22–36.)

/////

/////

On October 29, 2024, defendant filed the pending motion for judgment on the pleadings. (Doc. No. 20.) Plaintiff filed its opposition to that motion on November 12, 2024. (Doc. No. 21.) On November 22, 2024, defendant filed its reply thereto. (Doc. No. 22.)

**LEGAL STANDARD**

**A.     Motion for Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c) provides that: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."

A motion for judgment on the pleadings "challenges the legal sufficiency of the opposing party's pleadings[.]" *Morgan v. Cnty. of Yolo*, 436 F. Supp. 2d 1152, 1154–55 (E.D. Cal. 2006), *aff'd*, 277 F. App'x 734 (9th Cir. 2008). In reviewing a motion brought under Rule 12(c), the court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the nonmoving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

The same legal standards governing a Rule 12(b)(6) motion are applicable to a motion brought under Rule 12(c). *See Dworkin v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Accordingly, "judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Marshall Naify Revocable Tr. v. United States*, 672 F.3d 620, 623 (9th Cir. 2012) (quoting *Fajardo v. Cnty. of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999)); *see also Fleming*, 581 F.3d at 925 (stating that "judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law"). The allegations of the complaint must be accepted as true, while any allegations made by the moving party that contradict the allegations of the complaint are assumed to be false. *See MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006). The facts are viewed in the light most favorable to the non-moving party and all reasonable inferences are drawn in favor of that party. *See Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 360 (9th Cir. 2005).

/////

/////

6

B.  **California Contract Law**

Under California law, the interpretation of an insurance policy is a question of law. *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1995); *see also Universal Cable Prods., LLC v. Atlantic Specialty Ins. Co.*, 929 F.3d 1143, 1151 (9th Cir. 2019) ("[T]he interpretation of an insurance policy is a question of law . . . ."). A court interpreting the terms of an insurance policy must give the terms their plain and ordinary meaning. *See Wheeler v. Am. Fam. Home Ins. Co.*, 632 F. Supp. 3d 1063, 1071 (N.D. Cal. 2022); *see also Hoban v. Nova Cas. Co.*, 335 F. Supp. 3d 1192, 1201–02 (E.D. Cal. 2018) ("Insurance policies are construed under the typical rules of contract law, which require looking 'first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.'") (quoting *Waller*, 11 Cal. 4th at 18). "A contract term will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But 'courts will not strain to create an ambiguity where none exists.'" *Westport Ins. Corp. v. N. Cal. Relief*, 76 F. Supp. 3d 869, 879 (N.D. Cal. 2014) (quoting *Waller*, 11 Cal. 4th at 18–19). Further, a "contract must be interpreted as a whole." *RLI Ins. Co. v. City of Visalia*, 297 F. Supp. 3d 1038, 1049 (E.D. Cal. 2018); *see also Waller,* 11 Cal. 4th at 19; *Hoban*, 335 F. Supp. 3d at 1202. "The terms of a contract must be construed in a manner that takes into account the context of the language and is consistent with the contract as a whole." *Great Minds v. Office Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (citations and modifications omitted).

## ANALYSIS

In its pending motion, defendant argues that it is entitled to judgment on the pleadings with respect to all three of plaintiff's claims. As to plaintiff's claims for breach of contract and declaratory judgment, defendant argues that the Bond provides no coverage for the commission schemes that plaintiff has alleged to be the victim of. (Doc. No. 20-1 at 9–10.) As to plaintiff's claim for breach of the implied covenant of good faith and fair dealing, defendant argues that it is entitled to judgment in its favor because its claims determination was correct, or at the very least, based on a reasonable interpretation of the Bond. (*Id*. at 15.) In opposition, plaintiff argues that the commission schemes caused hundreds of thousands of dollars of loss which is covered under

three different Bond provisions:  the "Employee or Director Dishonesty" coverage, the "Faithful Performance – Enhanced" coverage, and the "Audit and Claims Expense" coverage.  (Doc. No. 21 at 8–11.)  Further, plaintiff argues that it has demonstrated defendant's bad faith by alleging that defendant "improperly delayed then denied its claim despite clear coverage under the Bond." (*Id*. at 11.)  The court will first take up the issue of coverage under each relevant Bond provision and then will discuss the effect of that analysis on each of plaintiff's three claims asserted in this action.

**A.      Coverage under the "Employee Or Director Dishonesty" Bond Provision**

As noted, the Bond provides coverage under its Employee Or Director Dishonesty Coverage for "loss resulting directly from dishonest acts committed by an employee or director." (Doc. No. 20-2 at 27.)  The Bond states that "dishonest acts" must be committed "with the intent to" either "cause [the insured] to sustain [] loss" or "obtain an improper financial benefit for the employee, director, or for any other person or entity." (*Id*.)  Critically, however, the Bond clarifies that "[a]s used in this coverage, loss does not include any employment benefits, including:  salaries, commissions, fees, bonuses, promotions, awards, profit sharing, business entertainment or pensions, intentionally paid by [the insured]," and an "improper financial benefit does not include any employment benefits received in the course of employment including salaries, commissions, fees, bonuses, promotions, awards, profit sharing, business entertainment or pensions." (*Id*.)

Defendant argues that because plaintiff concedes in its FAC that it seeks reimbursement for commission payments, "there is no coverage for [plaintiff's] claimed losses" "[u]nder the clear and unambiguous terms of the [B]ond." (Doc. No. 20-1 at 11.)  In opposition, plaintiff argues that the commission payments paid pursuant to the loan officers' schemes can still constitute an "improper financial benefit" or a "loss" because "[t]he plain meaning of the coverage" is "to cover any loss resulting from the dishonest acts of an employee that is not an employment benefit the employer would have paid to the employee anyway." (Doc. No. 21 at 8.) In the alternative, plaintiff argues that its allegations support coverage for the loss because plaintiff did not intentionally pay the commissions it paid as a result of these schemes. (*Id*. at 9.)

8

The court will first address below whether plaintiff has alleged an "improper financial benefit" before turning to whether plaintiff suffered a "loss" as required for coverage under this provision of the Bond.

1. <u>Improper Financial Benefit</u>

As noted above, plaintiff argues that despite the Bond language stating that "an improper financial benefit does not include any employment benefits received in the course of employment including salaries, commissions," etc., (Doc. No. 20-2 at 27), the commissions paid here are not excluded from coverage because they would not have been paid "in the absence of the fraud," and "the process by which [the funds] were stolen—fraudulently manipulating the commission processes—does not vitiate coverage" and "is irrelevant." (Doc. No. 21 at 8.) Defendant argues that this interpretation of the coverage provision language of the Bond would "render [an] entire clause superfluous." (Doc. No. 22 at 6.)

Both parties acknowledge that the Ninth Circuit addressed a similar question almost forty years ago in its decision in *James B. Lansing Sound, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 801 F.2d 1560 (9th Cir. 1986). In *James B. Lansing Sound, Inc.*, two of the plaintiff's employees "perpetrated a complex fraud" on the plaintiff company which involved submitting "large, fictitious purchase orders" with "lower than normal sales prices" and changed payment terms, receiving commissions on those sales, and reselling the products abroad to undercut authorized dealers. *Id*. at 1562–63. The plaintiff company submitted proof of its loss to its insurers, one of whom "maintained that [the plaintiff] incurred no recoverable losses," leading to an action being brought for breach of the insurance contract. *Id*. at 1563. The contract at issue provided coverage for "dishonest or fraudulent acts committed by such Employee with the manifest intent . . . to obtain financial benefit for the Employee . . . other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment." *Id*. at 1567. The plaintiff company argued that the commissions paid pursuant to the fraud scheme were recoverable because the "fraudulent sales of its equipment were not its normal course of business." *Id*. The Ninth Circuit rejected that argument, concluding that "under [the plaintiff's] theory, the exclusion of commissions

9

would have no meaning or effect because fraud and dishonest acts are not usually part of a normal course of business." *Id*. The court also noted that the plaintiff would have incurred those commission expenses "even if the merchandise had been sold at the list price" and not the lower than normal rate. *Id*. Accordingly, the court concluded that "the commission payments [were] excluded by the unambiguous terms" of the insurance policy. *Id*. The Eighth Circuit later reviewed a similar standard dishonesty provision and agreed that this interpretation gave "the entire provision [] meaning," noting that although this means "that the policy does not cover all types of employee theft, the employee dishonesty provision still provides coverage for many dishonest acts of employees," such as "forging checks, fraudulently using employer credit cards . . . embezzlement . . . stealing from inventory . . . and altering purchase orders to confer a benefit on the selling company." *R&J Enters. v. Gen. Cas. Co. of Wis.*, 627 F.3d 723, 727 (8th Cir. 2010).

Applying these holdings, the court concludes that the commission payments at issue here are plainly excluded from the definition of an "improper financial benefit" under the terms of the Employee Or Director Dishonesty provision, which specifically carve out "employment benefits received in the course of employment including salaries, commissions," etc. Plaintiff's strained interpretation of the contract language fails to take into account the context of the exclusion within a dishonesty provision. As noted, the provision specifies that "an improper financial benefit does not include any employment benefits received in the course of employment including salaries, commissions . . . ." (Doc. No. 20-2 at 27.) If the court interpreted this phrase, as plaintiff suggests, to only refer to "an employment benefit the employer would have paid to the employee anyway," the phrase would have little meaning in context and would carve out nothing, because a financial benefit can hardly be viewed as improper if an employee is entitled to it anyway. Instead, interpreting the language as plainly written, that an improper financial benefit does not include any employment benefit received in the course of employment including commissions, gives meaning to the entire phrase as it appears within the contract, because even if an employee's acts were dishonest and a resulting financial benefit from those acts seems "improper," coverage is excluded if the benefit was received by the employee in the specific

manner identified (through employment benefits).  See *Performance Autoplex II Ltd. v. Midcontinent Cas. Co.*, 322 F.3d 847, 858 (5th Cir. 2003) (holding for the insurer by finding that, where an employee obtained a pay increase for herself, the plain language of the policy excluded coverage for unauthorized salaries obtained due to employee dishonesty because if the phrase "normal course of employment" was interpreted to mean not "through employee dishonesty," "the policy language excluding salaries would become mere surplusage"); *Mortell v. Ins. Co. of N. Am.*, 120 Ill. App. 3d 1016, 1025–26 (1983) (concluding that bond language defining "dishonest or fraudulent acts" as those committed with intent to cause the insured to sustain loss and "to obtain financial benefit . . . other than salaries, commissions . . . or other employee benefits earned in the normal course of employment" was "unambiguous and must be given effect as written").

Accordingly, the court finds that plaintiff is not entitled to coverage under the Employee Or Director Dishonesty provision for the dishonest acts allegedly committed by its employees with the intent to obtain an "improper financial benefit," because under the provision's language an improper financial benefit does not include salaries, commissions, or other employment benefits.

2. <u>Loss</u>

Plaintiff next argues that the commission payments made as a result of the fraudulent scheme are recoverable under the Employee Or Director Dishonesty provision of the Bond as "dishonest acts [] committed by the employee [] with the intent to cause [plaintiff] to sustain such loss." (Doc. No. 20-2 at 27.)  However, as noted, the Bond provision similarly excludes from its definition of "loss" "any employment benefits, including:  salaries, commissions, fees, bonuses, promotions, awards, profit sharing, business entertainment or pensions, intentionally paid by you." (*Id.*)  Plaintiff's argument that the exception for employment benefits does not apply here because "the commissions at issue would not have been incurred anyway" fails for the same reason discussed above.  See *Renasant Bank v. St. Paul Mercury Ins. Co.*, 882 F.3d 203, 210 (5th Cir. 2018) ("We therefore agree with the district court that the Bond does not count commissions as the type of financial benefit that triggers coverage.  This interpretation is the most natural way

11

1    to read the Bond and is consistent with what other circuit courts have concluded in construing
2    such language."); *Mun. Sec., Inc. v. Ins. Co. of N. Am.*, 829 F.2d 7, 10 (6th Cir. 1987) ("We agree
3    with this reading of the policy language. The language explicitly excluded dishonest or
4    fraudulent acts intended to enhance the employee's regular compensation."); *Verex Assur., Inc. v.*
5    *Gate City Mortg. Co.*, No. 83-cv-00506-DKW, 1984 WL 2918, at *2 (D. Utah Dec. 4, 1984)
6    (finding that where the "allegations show that the loan officers engaged in the scheme in order to
7    obtain commissions" and the coverage requires an "intent by the employee to procure some sort
8    of financial benefit other than salary, commissions, or similar benefits," there is "simply" no
9    coverage).

10    However, plaintiff also argues that this exclusion does not apply because the commissions
11    at issue here were not "intentionally paid." (Doc. No. 21 at 9–10.) In this regard, plaintiff
12    contends that the "ordinary usage of 'intentionally paid' would never include money stolen or
13    embezzled by fraud" and that it "had no intent to pay fraudulent commissions." (*Id.* at 10.) In
14    reply, defendant argues that the plain and ordinary meaning of "intentionally" is "with an
15    awareness of what one is doing," and plaintiff has not alleged that the payment of the
16    commissions was accidental. (Doc. No. 22 at 8.) Defendant further argues that plaintiff's
17    interpretation of the language, "that 'intentionally paid' means 'with full knowledge of the
18    dishonest conduct'" would render the exception in the Employee Or Director Dishonest Bond
19    provision meaningless, "because companies typically will not pay employment benefits known to
20    be improperly gained." (*Id.* at 9.)

21    The court agrees that the phrase "intentionally paid" as used in the Bond provision at issue
22    does not require that the insured has full knowledge of any and all dishonesty. If the commission
23    payments at issue here were considered "unintentionally paid" by plaintiff due to the alleged
24    fraud, then the exception for employment benefits within the dishonesty provision would again
25    have no meaning. *See James B. Lansing Sound, Inc.*, 801 F.2d at 1567 (interpreting the Bond
26    provision such that each phrase has meaning). Indeed, the "intentionally paid" language would
27    swallow the entire exception in the context of any employee dishonesty. *See R&J Enters.*, 627
28    F.3d at 727 ("Under [the plaintiff's] proposed interpretation, the limiting language would be

superfluous, because benefits actually earned do not result from dishonest acts. . . . In other words, 'the language excluding salaries presumes that there are acts of employee dishonesty that result in increased employee benefits that the insured and insurer agreed to exclude from coverage.'") (quoting *Performance Autoplex II Ltd.*, 322 F.3d at 858).

Neither party cites any case law specifically discussing how to interpret the phrase "intentionally paid" in this context, and the court has been unable to identify any. Nonetheless, legal scholars have addressed revisions to standard form employee dishonesty provisions appearing in insurance contracts and their commentary further persuades the court that plaintiff's interpretation of the meaning of "intentionally paid" in this context is incorrect:

> Some claimants had argued that bonuses or commissions generated by a fraudulent scheme were not excluded because they were not *earned*. The replacement of 'earned' with 'received' makes clear that the provision is referring to whether the benefit is of a *type* that would ordinarily be received in the course of employment rather than the *nature* of the benefit, *e.g.*, earned or unearned. The 2004 revision takes the belt-and-suspenders approach of also excluding any employee benefits intentionally paid by the Insured from the definition of loss.

Jeffrey S. Price, Michael J. Sams, *Employee Dishonesty and Employee Theft: Similar but Not the Same*, 28 Fidelity L.J. 43, 56 (2022) (emphasis in original). This analysis suggests that standard employee dishonesty provisions have been revised to clarify that their intent is to exclude from coverage employment benefits categorically, and that the addition of the "intentionally paid" language was meant to emphasize that benefits paid out are excluded from coverage regardless of whether they were honestly earned or not. On the other hand, the only authority plaintiff cites to in support of its position that commissions can never be "intentionally paid" in the context of fraud is California Civil Jury Instruction 1320, which defines "intent" as an element of an assault or battery or other intentional torts—a context which has little applicability here. (Doc. No. 21 at 10) (citing Jud. Council of Cal. Civ. Jury Instructions (2023), No. 1320).

The court finds plaintiff's argument on this point to be unpersuasive and concludes that, under the plain language of the Bond provision, plaintiff has not suffered a recoverable "loss" by way of its payment of the commissions. Because plaintiff's allegations do not support coverage for a "loss" or an "improper financial benefit," plaintiff cannot recover under the Employee Or

13

1 | Director Dishonesty provision of the Bond.

2 | **B.     Coverage under the "Faithful Performance – Enhanced" Bond Provision**

As mentioned, the Bond also contains a "Faithful Performance – Enhanced" provision, which states that the insurer will pay for the insured's "loss resulting directly from a named employee's failure to faithfully perform his/her trust." (Doc. No. 20-2 at 31.) The "definitions" section of the Bond defines the "failure to faithfully perform his/her trust" as "acting in conscious disregard of your established and enforced share or deposit policies or that portion of your established and enforced lending policy which sets out the parameters which must be met in order for a 'loan' to be approved." (*Id*. at 49.) This definition also specifically clarifies that "[f]ailure to faithfully perform his/her trust does not mean . . . [c]onscious disregard of any policies other than lending, share or deposit policies." (*Id*.)

In the pending motion for judgment on the pleadings, defendant observes that the "faithful performance coverage provides indemnity for losses associated with defaulted loans if the lending officer intentionally violated the credit union's underwriting standards when approving the loan." (Doc. No. 20-1 at 13.) Defendant argues that while plaintiff alleges that its "lending officers devised a scheme to sidestep the commission plan," the FAC contains no allegations implicating lending policy or the standards for loan approval. (*Id*.) It argues that "[t]he very nature of the claim forecloses the possibility of faithful performance coverage" because plaintiff "alleges its loan officers manipulated the manner in which loans were classified internally," but not "that the loans themselves should not have been approved." (*Id*. at 14.) In opposition, plaintiff offers only the following:

> Travis had in place established lending policies with the parameters for the approval of real estate loans. By misclassifying the originations of real estate loans for purposes of generating improper and fraudulent commissions, and by styling loans as new money when they were not, Travis's loan officers acted in conscious disregard of these established lending policies. Accordingly, coverage pursuant to the "Faithful Performance – Enhanced" coverage exists.

(Doc. No. 21 at 11.)

/////

14

The court has reviewed plaintiff's FAC and finds that it contains no allegations regarding any share, deposit, or lending policies that would support coverage for any loss suffered pursuant to the Faithful Performance – Enhanced Bond provision. Plaintiff's FAC contains allegations regarding its employees' misclassification of loans, and it alleges that "[t]he Faithful Performance – Enhanced Coverage provides that CUMIS will pay for loss resulting directly from an employee's failure to faithfully perform his or her trust" and that "despite the clear and unambiguous language of the . . . Faithful Performance – Enhanced Coverage, CUMIS denied coverage . . . ." (Doc. No. 8 at ¶¶ 10, 11, 17, 19.) However, these allegations are insufficient to allege that plaintiff's employees "failed to faithfully perform [their] trust," which requires acting in conscious disregard of specific policies as defined in the Bond. Further, the court is unpersuaded by plaintiff's argument in opposition that it "had in place established lending policies with the parameters for the approval of real estate loans" and that its loan officers acted in conscious disregard of those lending policies when they misclassified the originations of real estate loans. (Doc. No. 21 at 11.) Plaintiff provides no detail as to the lending policies that its employees purportedly violated and does not even attempt to connect the dots between its employees' alleged actions, which involved misclassifying loans "shortly before or after" the loans funded, (Doc. No. 8 at ¶ 10), and the internal process for approval of those loans. Accordingly, the court finds that plaintiff's allegations do not support its recovery under the Faithful Performance – Enhanced coverage of the Bond.

**C.    Coverage under the "Audit And Claims Expense" Bond Provision**

In its FAC, plaintiff alleges that it spent $43,058.76 on an audit upon discovery of its employees' fraudulent acts. (Doc. No. 8 at ¶ 13.) Plaintiff alleges that this loss "falls squarely within" the Bond's "Audit and Claims Expense coverage, which provides that CUMIS will pay the necessary and reasonable fees and expenses Plaintiff has paid for a special audit of its records to establish a valid and collectible loss." (*Id*. at ¶¶ 18, 20.) In its motion, defendant argues that these "fees are not covered until and unless Travis establishes a covered claim," and "[b]ecause there is no coverage for Travis's claim under the employee dishonesty or faithful performance coverages, there is also no coverage for audit expenses." (Doc. No. 20-1 at 14–15.) Plaintiff

responds by arguing that because it "has established 'a valid and collectible loss' pursuant to the 'Employee or Director Dishonesty' and the 'Faithful Performance – Enhanced' coverages," "there is also coverage for audit expenses." (Doc. No. 21 at 11.)

Because the court has determined that plaintiff's allegations do not support coverage under either of the previously discussed provisions, the allegations of plaintiff's FAC also do not support coverage of plaintiff's $43,058.76 in audit expenses incurred under the Audit And Claims Expense provision. Therefore, the court concludes that plaintiff is not entitled to coverage under any of the Bond provisions under which it seeks coverage.

**D.     Judgment on the Pleadings**

As noted at the outset, in its pending motion defendant requests that the court enter judgment on the pleadings in its favor as to all causes of action asserted in plaintiff's FAC. (Doc. No. 20-1 at 16.) The court finds that, pursuant to the analysis set forth above, judgment on the pleadings is appropriate as to each of plaintiff's three claims for: breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief.

        1.     <u>Breach of Contract</u>

To bring a claim for breach of contract, a plaintiff must show: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damages to the plaintiff. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Defendant is entitled to judgment on the pleadings because plaintiff's allegations cannot satisfy the third element—breach. Because the court has found that plaintiff is not entitled to coverage for the alleged actions of its employees under the Bond provisions identified, plaintiff has failed to demonstrate that defendant breached any terms of the Bond when it denied plaintiff's claim for coverage. Accordingly, the court will grant defendant's motion as to plaintiff's breach of contract claim. *See Body Xchange Sports Club, LLC v. Zurich Am. Ins. Co.*, 648 F. Supp. 3d 1205, 1220–21 (E.D. Cal. 2022) (granting the defendant's motion for judgment on the pleadings as to the plaintiff's breach of contract claim where the plaintiff did "not have a valid claim to benefits under the insurance policy").

/////

16

        2.        <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

California has a well-established cause of action sounding in tort, rather than contract, against an insurer who breaches the implied covenant of good faith and fair dealing with its insured, when it "unreasonably and in bad faith withholds payment of the claim of its insured." *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683–85 (1988) (en banc) (quoting *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 575 (1973)). "While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim 'without fully investigating the grounds for its denial.'" *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720–21 (2007) (quoting *Frommoethelydo v. Fire Ins. Exch.*, 42 Cal. 3d 208, 215 (1986)). The ultimate question in considering a bad faith claim is "whether the refusal to pay policy benefits was unreasonable." *Ospal v. United Servs. Auto. Ass'n*, 2 Cal. App. 4th 1197, 1205 (1991); *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347 (2001) ("[B]efore an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted unreasonably or without proper cause.").

Here, because the court has found that defendant properly denied plaintiff's insurance coverage claim, it also concludes that plaintiff's FAC fails to state a claim for bad faith. *See Waller*, 11 Cal. 4th at 36 ("It is clear that if there is no potential for coverage . . . there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."). Accordingly, defendant's motion for judgment on the pleadings as to plaintiff's claim for breach of the implied covenant of good faith and fair dealing will also be granted. *See Islands Rests., LP v. Affiliated FM Ins. Co.*, 532 F. Supp. 3d 948, 955 (S.D. Cal. 2021) ("Here, because Plaintiffs are not 'due' any benefits under the Policy's general business interruption provision, they fail to state a claim for bad faith. . . . Accordingly, the Court grants Defendant's motion for judgment on the pleadings as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.").

/////

        3.      <u>Declaratory Relief</u>

In its FAC, plaintiff seeks declaratory relief recognizing defendant's "obligation to indemnify [p]laintiff for losses suffered as a result of the fraud perpetrated by its employees." (Doc. No. 8 at ¶ 34.) Again, because the court has concluded that defendant has no obligation to indemnify plaintiff for the alleged fraud, defendant is also entitled to judgment in its favor as to plaintiff's declaratory relief claim. *See Crown Intermediate Holdco Inc. v. Allianz Glob. Risks US Ins. Co.*, No. 2:22-cv-01248-SB-AFM, 2022 WL 2301880, at \*6 (C.D. Cal. June 17, 2022) ("Because Regal has not plausibly alleged any physical loss or damage . . . the policy provisions it invokes do not provide coverage for its losses as a matter of law. Regal's claims for breach of contract and declaratory judgment therefore fail, and Defendants are entitled to judgment on the pleadings."), *aff'd*, No. 22-55661, 2024 WL 5040044 (9th Cir. Dec. 9, 2024); *Wallis v. Centennial Ins. Co.*, 927 F. Supp. 2d 909, 918 (E.D. Cal. 2013) (finding that because the plaintiffs had not pled cognizable claims for breach of contract and bad faith, "their request for declaratory relief against [the defendant] also falls"); *see also Sacramento Downtown Arena LLC v. Factory Mut. Ins. Co.*, 637 F. Supp. 3d 865, 872 (E.D. Cal. 2022) (noting that the defendant's "arguments about the plaintiffs' claims for declaratory relief . . . are derivative of [its] arguments about the contract claim").

**E.**     **Leave to Amend**

"Although Rule 12(c) does not mention amendments, courts have discretion to grant a Rule 12(c) motion with leave to amend." *Satvati v. Allstate Northbrook Indem. Co.*, 634 F. Supp. 3d 792, 800 (C.D. Cal. 2022) (citation omitted). "The court should give leave [to amend] freely when justice so requires." Fed. R. Civ. P. 15(a)(2). In the Ninth Circuit, "Rule 15's policy of favoring amendments to pleadings should be applied with extreme liberality." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). Generally, denial of leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." *Intri-Plex Techs. v. Crest Grp.*, 499 F.3d 1048, 1056 (9th Cir. 2007) (citation omitted); *see also Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("Leave need not be granted where the amendment of the complaint . . . constitutes an exercise in futility . . . .").

18

1          In its opposition to the pending motion, plaintiff requests that the court deny defendant's motion for judgment on the pleadings, or alternatively, it "requests leave to amend its [FAC]." (Doc. No. 21 at 13.)  While not dispositive, plaintiff offers no suggestion as to any new allegations it would, or could in good faith, include or other amendments it would make if granted leave to file a second amended complaint. *Cf. Brooks v. Tapestry, Inc.*, No. 2:21-cv-00156-DAD-JDP, 2022 WL 21872531, at *2 (E.D. Cal. Oct. 31, 2022) (granting the defendant's motion for judgment on the pleadings with leave to amend where the plaintiff "proffer[ed] [] allegations that would appear to address the pleading deficiency underlying [the] defendant's motion").

          In the court's view, it is apparent that plaintiff's FAC cannot be cured by amendment because the factual nature of the allegations at issue here, namely that plaintiff's employees misclassified loans shortly before or after the loans funded for the purpose of generating higher commissions, is not compatible with coverage under the Bond provisions identified.  The relevant legal authority supports the court's conclusion as to the lack of coverage under the Bond, and plaintiff has not cited to, nor has the court independently found, any authority supporting plaintiff's position or suggesting that amendment could cure the defects discussed herein.  Accordingly, the court finds that granting plaintiff leave to file a second amended complaint under these circumstances would be futile. *See Satvati*, 634 F. Supp. 3d at 800 (granting the defendant's motion for judgment on the pleadings without leave to amend, finding that "[b]ecause the defective breach of contract claim cannot be cured through amendment, leave to amend would be futile"); *Body Xchange Sports Club*, 648 F. Supp. 3d at 1221 (granting the defendant's motion for judgment on the pleadings without leave to amend where the plaintiff did not "explain how amendment could save their claims" and the "cause of [the plaintiff's] loss . . . fall[s] squarely within [a policy exclusion]"); *Diaz v. Trans Union LLC*, No. 1:18-cv-01341-DAD-EPG, 2019 WL 2389937, at *4 (E.D. Cal. June 6, 2019) (finding that "the complaint cannot be saved by amendment and granting leave to amend would therefore be futile" where the "clear weight of the authority on the dispositive issue is contrary to [the] plaintiff's position").

/////

/////

**CONCLUSION**

For the reasons set forth above:

1. Defendant's motion for judgment on the pleadings (Doc. No. 20) is GRANTED as to all claims asserted against it, without leave to amend;

2. The Clerk of the Court is directed to enter judgment in favor of defendant CUMIS Insurance Society, Inc.; and

3. The Clerk of the Court is directed to CLOSE this case.

IT IS SO ORDERED.

Dated: **June 13, 2025**

*/s/ Dale A. Drozd*
DALE A. DROZD
UNITED STATES DISTRICT JUDGE